## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## COLUMBUS DIVISION

| | |
|---|---|
| **TRUIST BANK and TRUIST EQUIPMENT FINANCE CORP.,**<br><br>    Plaintiffs,<br><br>  vs.<br><br>**STALWART PLASTICS, INC. and FRUMA PLASTICS SA de CV,**<br><br>    Defendants. | Case No.: _____ |

## VERIFIED COMPLAINT FOR DAMAGES
## AND THE EMERGENCY APPOINTMENT OF RECEIVER

COME NOW, Plaintiff Truist Bank and Truist Equipment Finance Corp. (collectively, "**Plaintiffs**") and files this *Verified Complaint for Damages and the Emergency Appointment of Receiver*, showing the Court as follows:

### JURISDICTION AND VENUE

1.    This Court has jurisdiction over this matter under 28 U.S.C. §§ 1332 and 1367(a) and the doctrine of supplemental jurisdiction because the amount in controversy exceeds $75,000 and involves citizens of different states, and/or citizens of a state and a subject of a foreign state.

2.    Venue in the Middle District of Georgia is proper under 28 U.S.C. § 1391 because a defendant resides in this district, a substantial part of the events

or omissions giving rise to the claim occurred in this district, and the business and some or all of the property that is the subject of the request for the appointment of a receiver is located in this district.

3.     Pursuant to the loan documents discussed below, Defendants irrevocably and unconditionally submitted to the jurisdiction and venue of the courts in the State of Georgia.

## PARTIES

4.     Plaintiff Truist Bank (**"Truist"**) is a North Carolina banking corporation.

5.     Plaintiff Truist Equipment Finance Corp. ("**TEFC**") is a corporation registered to do business in the State of Georgia.

6.     Defendant Stalwart Plastics, Inc. ("**Stalwart**") is a Nevada corporation, which maintains its principal place of business at 240 N. 48th Avenue, Phoenix, Arizona 85043.   Stalwart may be served through its registered agent: CT Corporation System, 289 S. Culver St., Lawrenceville, Georgia 30046.

7.     Defendant Fruma Plastics SA de CV ("**Fruma**") is a Mexican business entity with is principal place of business at 116 Prol Corregidora Nte, 76140 Queretaro Queretaro Mexico.  Fruma may be served pursuant to Fed. R. Civ. P. 4(f) and 4(h)(2).

## INTRODUCTION

8.    This action arises out of Stalwart's multiple defaults on a revolving line of credit, a corporate credit card agreement, and two equipment finance loans. In the aftermath of Stalwart's defaults, Stalwart has: (i) failed to timely make payments due under the applicable loan documents, which have now fully matured; (ii) refused to provide Plaintiffs with contractually-required financial reporting; (iii) refused, after demand, to direct its customers to pay the proceeds of all outstanding accounts receivable owing to Stalwart into its Truist operating account and refused to transfer any funds paid into any other accounts into Truist pursuant to Truist's contractual remedies; (iv) initially refused Plaintiffs requests to inspect and evaluate its collateral, and then eventually permitted limited, highly-controlled access to only a portion of the collateral under threat of expulsion; (v) admitted that it intended to release and/or move equipment from its facility that may be subject to competing liens and security interests; (vi) made material misrepresentations regarding Plaintiffs' collateral; (vii) made material misrepresentations regarding Stalwart's financial viability; (viii) made material misrepresentations regarding the identity of the manufacturer of the equipment financed by Plaintiffs' loans, and "substantiated" draws on those loans with false and fraudulent invoices; (ix) reduced or eliminated most of its current business activity. Further, Stalwart's officers have admitted to substantial internal finan-

cial fraud and embezzlement at Stalwart, and have admitted that false and fraudulent financial documentation has been supplied to Plaintiffs. As of the date of this filing, Stalwart owes Plaintiffs in excess of $20 million under the loans.

9.    Plaintiffs bring this action to recover Stalwart's debt, to protect Plaintiffs' legitimate security interests in the collateral against the manifest risk of further loss through the appointment of an equitable receiver, and to stop the corporate waste, mismanagement, fraud, and dispersion of collateral by Defendants. Plaintiffs seek the appointment of a receiver pursuant to Rule 66 of the Federal Rules of Civil Procedure, 28 U.S.C. § 754, and federal common law.

## FACTS COMMON TO ALL CAUSES OF ACTION

10.    Stalwart is a manufacturer of stretch, plastic film, operating out of its manufacturing plant in Midland, Georgia.

11.    Fruma is Stalwart's parent.

12.    Amalia C. Contreras a/k/a Amalia Luna a/k/a Amalia Cecilia Luna Contreras ("**Contreras**") is Stalwart's Chief Executive Officer, and, on information and belief, the 95% owner of Fruma.

13.    Stalwart applied for and received three commercial loans as well as a corporate credit card from Truist, or Truist's affiliate, TEFC, from 2021 through 2022, described and defined in greater detail below.

### A.    The Revolver

14.    Stalwart and Truist are parties to a Commercial Note dated June 9, 2021, by which Stalwart was permitted to borrow up to a maximum of $6 million on a revolving line of credit (the "**Note**"). This Note was later amended by the First Amendment to Commercial Note, dated January 7, 2022, by which the revolving line of credit was increased to $12 million (the Note and the First Amendment to the Note are, collectively, the "**Revolver**," true and correct copies of which are attached as **Exhibit A**).

15.    In connection with the Note, Stalwart and Truist entered into an Agreement Relating to Commercial Note, dated June 9, 2021, which was later amended on January 7, 2022 (collectively, the "**Revolver Agreement,**" true and correct copies of which are attached as **Exhibit B**).

16.    On June 9, 2021, Stalwart executed a Security Agreement (Commercial) (the "**Revolver Security Agreement**"), which granted Truist a blanket security interest in substantially all of Stalwart's assets, including but not limited to Stalwart's accounts, inventory, furniture, fixtures and equipment, goods, deposit accounts, books and records, instruments, accounts receivable, and intangible property (the "**Revolver Collateral**"), with such collateral securing the Revolver and any other current or future indebtedness to Truist, including the corporate credit card obligations. A true and correct copy of the Revolver Security Agree-

ment is attached as **<u>Exhibit C</u>**.

17.     The Revolver Collateral is, by agreement, located in and is not to be removed from 7791 Chattsworth Road, Midland, Georgia 31820.

18.     The Revolver Security Agreement also grants Truist the right to inspect the Revolver Collateral at any reasonable time and to obtain appraisals as Truist deems necessary in its sole discretion from time to time. Truist also has the right to access, inspect, verify, examine, and audit Stalwart's books and records at any time.

19.     Pursuant to the Revolver Security Agreement, Stalwart is obligated to maintain complete and accurate books and records, including all records related to its accounts, in connection with Truist's inspection rights. Additionally, Stalwart is required to maintain the Revolver Collateral in good condition and repair, and to promptly notify Truist of any substantial changes related to the type or quantity of its inventory or as to any event that would materially affect its value or Truist's security interest therein.

20.     Pursuant to the Revolver Security Agreement, Stalwart is prohibited from pledging or granting a security interest in any of the Revolver Collateral to any creditor other than Truist and is prohibited from permitting any lien or encumbrance to attach to any of the Revolver Collateral. Further, Stalwart cannot allow anyone to use the Revolver Collateral in any manner that is inconsistent

with the Security Agreement.

21.    On June 15, 2021, Truist perfected its security interest in the Revolver Collateral, which consists of personal property, equipment, intangible property, accounts, and other assets in which a security interest can be perfected by filing of a UCC-1 Financing Statement by filing UCC-1 Financing Statement No. 2021176266-9 with the Secretary of State in Nevada, a true and correct copy of which is attached as **Exhibit D**.

22.    In addition to the Revolver Security Agreement and Revolver Guaranty, Stalwart also executed an authorization for Truist to debit Stalwart's operating account for all payments due under the Revolver.

23.    Pursuant to the Revolver Agreement, Stalwart is obligated to timely deliver other financial information to Truist, including but not limited to: (i) annual, consolidated, and audited financial statements; (ii) unaudited quarterly financial statements certified by an officer of Stalwart as to their accuracy; (iii) an accounts receivable aging report; and (iv) federal income tax returns. Upon delivery of the foregoing financial information to Truist, Stalwart contractually reaffirmed the accuracy of its representations and warranties in the Revolver and confirmed that there was no event of default under the Revolver.

24.    Stalwart has borrowed, and Truist has advanced, the maximum $12 million available under the Revolver. The principal was due on the maturity date

of the Commercial Note, which was originally April 30, 2023, but which was internally extended by Truist on a month-to-month basis through October 19, 2023.

25.    Interest accrues on the principal pursuant to the terms of the Revolver. Additionally, late charges and fees are incurred on untimely payments. In any enforcement action, Stalwart is further liable for, among other things, all expenses, costs, and attorney's fees related to the enforcement of the terms of the Revolver, regardless of whether suit is brought, plus the costs incurred in evaluating, preserving, or disposing of any Revolver Collateral.

26.    The Revolver has matured by its express terms and Stalwart is in default under the terms of the Revolver as a result of its failure to repay in full the aggregate outstanding balance of the principal and accrued interest thereunder on the maturity date as well as its numerous other defaults.

**B.    Equipment Finance Loan**

27.    On August 27, 2021, Stalwart took out a $6 million delayed draw equipment finance loan from TEFC for the purpose of financing the acquisition of a coextrusion castfilm plastic extrusion manufacturing line for stretch wrap film known as "Line 3" (CC/120, 120, 75, 75/3800/650 (the "**TEFC Loan**").

28.    On numerous occasions, Stalwart represented to TEFC, in writing, that Empaques Poliplasticos sa de CV was manufacturing Line 3.

29.    The TEFC Loan is evidenced by: (i) a Promissory Note payable to

TEFC in the original principal amount of up to $6 million dated August 27, 2021; (ii) an amendment by letter agreement dated March 28, 2022; (iii) an amendment by letter agreement dated April 13, 2022; (iv) a First Amendment to Promissory Note dated April 13, 2022, pursuant to which the maximum amount of the TEFC Loan was increased from $6 million to $7.5 million; (v) an amendment by letter agreement dated January 13, 2023; (vi) an amendment by letter agreement dated June 1, 2023; (vii) an amendment by letter agreement dated August 3, 2023; (viii) a Master Security Agreement No. 10884 dated July 23, 2021; (ix) a Security Agreement (Commercial) dated January 27, 2023; and (x) any other loan documents related to the TEFC Loan (collectively, the "**TEFC Loan Documents**"). True and correct copies of the TEFC Loan Documents are attached as **Exhibit E (loan documents) and F (security agreements)**.

30.    The Master Security Agreement, granted TEFC a first priority security interest in Line 3, and later, on January 27, 2023, Stalwart executed a Security Agreement (Commercial), which granted TEFC a blanket security interest in substantially all of Stalwart's assets, including but not limited to Stalwart's accounts, inventory, furniture, fixtures and equipment, goods, deposit accounts, books and records, instruments, accounts receivable, and intangible property (the "**TEFC Loan Collateral**").

31.    TEFC perfected its security interests in Line 3 by filing UCC-1 Fi-

nancing Statement No. 2021193243-9 with the Secretary of State in Nevada, and, in an abundance of caution, TEFC further perfected its security interest in the equipment by filing the TEFC UCC Statement as a fixture filing in the office of the Clerk of Superior Court of Muscogee County, Georgia, at Book 13570, page 63. On January 20, 2023, TEFC perfected its security interest in the TEFC Loan Collateral by filing UCC-1 Financing Statement No. 2023304278-2 with the Secretary of State in Nevada.  True and correct copies of the UCC Financing Statements referenced in this paragraph are attached as **Exhibit G**).

32.    On July 23, 2021, Stalwart's Landlord, Quantico Plastics Group, Inc. ("**Quantico**"), executed a Landlord's Waiver with TEFC, agreeing that the TEFC Collateral, including but not limited to Line 3, constitutes personal property and is *not* fixtures, and subordinating its rights to TEFC with respect to the TEFC Collateral.  A true and correct copy of the Landlord's Waiver is attached as **Exhibit H**. On information and belief, Quantico is an affiliate of Stalwart.

33.    Interest accrues on the principal pursuant to the terms of the TEFC Loan. Additionally, late charges and fees are incurred on untimely payments. In any enforcement action, Stalwart is further liable for, among other things, all expenses, costs, and attorney's fees related to the enforcement of the terms of the TEFC Loan, regardless of whether suit is brought, plus the costs incurred in evaluating, preserving, or disposing of any of the TEFC Loan Collateral.

34.    Pursuant to the terms of the TEFC Loan, TEFC made advances on a delayed draw basis over time to fund the manufacture, building, development, installation, and deployment of equipment Line 3 at Stalwart. Pursuant to the TEFC Loan Documents, the money advanced and disbursed under the TEFC Loan was to be used *solely* for the purchase, assembly, and modification of Line 3 for use in Stalwart's manufacturing operations.

35.    TEFC made eleven total disbursements under the TEFC Loan. Specifically, TEFC advanced: $800,000 on August 26, 2021; $800,000 on October 12, 2021; $1,000,000 on December 29, 2021; $450,000 on March 11, 2022; $500,000 on March 16, 2022; $600,000 on March 28, 2022; $500,000 on April 5, 2022; $400,000 on July 1, 2022; $550,000 on November 17, 2022; $900,000 on December 9, 2022; and $500,000 on December 29, 2022.

36.    The original maturity date of the TEFC Loan was March 31, 2022, but this date was extended to August 21, 2023, by amendment. The TEFC Loan has matured by its express terms, and Stalwart is otherwise in default of the terms of the TEFC Loan as a result of its failure to repay in full the aggregate outstanding balance of the principal and accrued interest on the maturity date and due to its numerous other defaults.

**C.    The DDTL Loan**

37.    On June 28, 2022, Stalwart took out an $8 million delayed draw term

loan from Truist for the purpose of financing the acquisition and building of a 9-layer plastic coextrusion castfilm allrollEx 3000 mm manufacturing line known as "Line 4" (SN 21 SQ00844/2) (the **DDTL Loan**"). Stalwart represented to Truist that Empaques Poliplasticos sa de CV was manufacturing Line 4.

38.    The DDTL Loan is evidenced by a Promissory Note payable to Truist and a Loan Agreement, dated June 28, 2022, true and correct copies of which are attached as **Exhibit I**.

39.    On June 28, 2022, Stalwart executed a Security Agreement, which granted Truist a blanket lien in substantially all of Stalwart's assets (the **"DDTL Collateral**." A true and correct copy of this security agreement is attached as **Exhibit J.** The Revolver Collateral, the TEFC Collateral, and the DDTL Collateral are sometimes collectively referred to as, the "**Collateral**."

40.    On June 30, 2022, Truist perfected its security interest in the DDTL Collateral by filing UCC-1 Financing Statement No. 2022250459-2 with the Secretary of State of Nevada, a true and correct copy of which is attached as **Exhibit K**.).

41.    Pursuant to an Authorization to Debit Account for Pre-Arranged Payments, Stalwart also agreed that Truist to debit Stalwart's deposit account for all payments due under the DDTL Loan.

42.    On June 8, 2022, Quantico executed a Landlord's Waiver with Truist,

agreeing that the DDTL Collateral, including but not limited to Line 4, constitutes personal property and is *not* fixtures, and subordinating its rights to Truist with respect to the DDTL Collateral.

43.     Pursuant to the terms of the DDTL Loan Promissory Note, Stalwart requested advances on a delayed draw basis for the first eighteen (18) months after the closing date to build the equipment for Line 4. Pursuant to the DDTL Loan Agreement, the money advanced and disbursed under the DDTL Loan was to be used *solely* for the purchase, assembly, and modification of Line 4.

44.     Pursuant to the DDTL Loan Security Agreement, Truist has the right to inspect and appraise the DDTL Collateral, to examine and copy the records and books of account, to visit Stalwart's properties, and to discuss Stalwart's books and records with its independent accountant and any of Stalwart's officers, directors, managers, members, or partners.

45.     Pursuant to the DDTL Loan Agreement, Stalwart agreed to maintain its books and records in accordance with GAAP, and further committed to certain affirmative financial covenants, including minimum year-to-date revenue requirements, EBITDA benchmarks, among other requirements.

46.     Truist made 9 total disbursements over 17 months. Specifically, Truist advanced: $16,231 on June 30, 2022; $817,500 on November 7, 2022; $350,000 on January 30, 2023; $1,000,000 on March 7, 2023; $1,500,000 on April 12, 2023;

$1,000,000 on May 30, 2023; $300,000 on July 13, 2023; $225,000 on July 13, 2023; and $810,000 on October 5, 2023.

47.    The first eighteen (18) months of the DDTL Loan was an interest only period, with interest payments first due beginning July 1, 2022, on a monthly basis, and installment payments on the principal first due January 1, 2024. Late charges also accrue on any untimely payment.

48.    The maturity date of the DDTL Loan is December 1, 2029.

49.    Stalwart is in default under the terms of the DDTL Loan by failing to make the interest-only payments and failure to commence the principal installment payments. Truist notified Stalwart of this default in writing on January 12, 2024, and hereby accelerates all amounts due thereunder. Further, Stalwart is in default under the terms of the DDTL Loan based on its cross-default of the Revolver and the TEFL Loan pursuant to the terms of the DDTL Loan Agreement.

### D.    Corporate Credit Card Agreement

50.    Stalwart also has a corporate credit card agreement with Truist.

51.    Stalwart currently owes in excess of $500,000 on its credit card account and has failed to make payments thereon since January 16, 2024. In addition, on January 22, 2024, Stalwart bounced a payment from its Truist account. This allowed Stalwart to charge an additional $209,519.46 above its $500,000 credit card limit before the payment processed as declined for insufficient funds.

### E.    <u>Fruma's Guaranties</u>

52.    Stalwart's parent company, Fruma, unconditionally guaranteed the payment of all of Stalwart's obligations under the Revolver, the TEFC Loan, and the DDTL Loan. Specifically, on (i) June 9, 2021, Fruma executed an Unconditional Guaranty in favor of Truist as to the Revolver (the "**Revolver Guaranty**," a true and correct copy of which is attached as <u>**Exhibit L**</u>), (ii) July 23, 2021, Fruma executed an Unconditional Guaranty in favor of TEFC (the "**TEFC Guaranty**," a true and correct copy of which is attached as <u>**Exhibit M**</u>), and (iii) June 28, 2022, Fruma executed an Unconditional Guaranty in favor of Truist on June 28, 2022 (the "**DDTL Guaranty**," a true and correct copy of which is attached as <u>**Exhibit N**</u>).  The Revolver Guaranty, the TEFC Guaranty, and the DDTL Guaranty are sometimes collectively referred to as, the "<u>**Fruma Guaranties**</u>."

53.    Under the terms of the Fruma Guaranties, Fruma waived notice of default, presentment, or demand, and further waived all defenses, offsets, and counterclaims that Fruma may have to any claim of Truist against Stalwart.

54.    Under the terms of the Fruma Guaranties, Fruma, as guarantor, is obligated to timely deliver annual consolidated financial information, balance sheets, statements of income, and statements of cash flow to Plaintiffs.

### F.    <u>Discovery of Stalwart's Financial Malfeasance and Fraud</u>

55.    Stalwart defaulted on the Revolver by failing to pay the aggregate

outstanding amounts due thereunder on the maturity date of October 19, 2023.

56.    Stalwart defaulted on the TEFC Loan by failing to pay the aggregate amounts due thereunder on the maturity date of August 21, 2023.

57.    Either of the foregoing events of default triggered cross-defaults of all indebtedness of Stalwart in favor of Truist and TEFC, including under the Revolver, the TEFC Loan, the DDTL Loan, and the corporate credit card agreement. Accordingly, all such indebtedness of these loan agreements is now due and payable in full.

58.    In October 2023, Truist conducted due diligence in connection with the underwriting of a potential renewal of the Revolver.

59.    As part of Plaintiffs' due diligence, a bank manager discovered that Contreras, Stalwart's CEO and one of its individual, indirect owners, is a named defendant in an arbitration confirmation lawsuit filed in the United States District Court for the District of Arizona, styled as *UniCredit Bank Austria AG v. Immobiliaria y Arrendadora Cuadro S.A. de C.V., et al.*, Case No. 2:23-cv-01991 (filed Sept. 21, 2023) (the "**Arizona Litigation**"). A true and correct copy of this complaint is attached as **Exhibit O**.

60.    In the Arizona Litigation, it is alleged that Contreras, along with her son, Miguel Angel Peredo Luna ("**Luna**"), and her daughter-in-law, Maria de Los Angeles Luna Gale, are part of a wide-ranging, fraudulent scheme to defraud

banks and other creditors, including by taking out loans to acquire plastic film extruding equipment, defaulting on those loans, and absconding with the equipment by transferring it to affiliated entities in a complex shell game.

61.    Indeed, the plaintiff in the Arizona Litigation alleged that in the wake of its arbitration award, Contreras and Luna absconded with the property of Immobiliaria y Arrendadora Cuardo S.A. de C.V., another purported affiliate of Stalwart, to avoid its bank creditor.

62.    Further, the Arizona Litigation plaintiff identified other creditors similarly alleged to have been defrauded by Contreras and Luna, or entities controlled by one or both of them, including Sterling Bank and World Business Capital, which were allegedly defrauded out of $6.9 million for the finance of plastic film manufacturing equipment for Stalwart's purported affiliate Hi-Films S.A. de C.V.

63.    Additionally, OneWest Bank (f/k/a La Jolla Bank) was allegedly defrauded out of $10 million for Stalwart-affiliate PG Films, LLC. During the pendency of the later suit, a receiver was appointed, but it is alleged Contreras and/or Luna, or entities controlled by one or both of them, moved all of the film manufacturing equipment out of the PG Films facility before the receiver could take control.

64.    Further, HSBC plc was alleged to have been defrauded out of $2.9

million for Stalwart purported affiliate Grupo Cuadro S.A. de C.V., again to finance the purchase of plastic film manufacturing equipment. Contreras and/or Luna, or entities controlled by one or both of them, are also alleged to have absconded with this equipment to avoid creditors, and allegedly transferred it to another Stalwart affiliate, Zummit Plastics, Inc. ("**Zummit**").

65.    Upon discovering the Arizona Litigation, Truist scrutinized the invoices that Stalwart submitted from Empaques Poliplasticos, the purported manufacturer of Lines 3 and 4, which were used to substantiate Stalwart's draws on the equipment-finance loans, which unveiled numerous irregularities. Specifically:

- Empacques Poliplasticos does not appear to exist. There is no website for an entity with that name. There is, however, a website for Empacques Plasticos (*not Poli*plasticos), which identifies the company as a manufacturer of plastic film—like Stalwart—*not* a manufacturer of the *equipment* lines used to manufacture such film;

- The address on the invoices for Empaques Polipasticos did not match the address for Empacques Plasticos, according to its website;

- The Google Maps result for the address listed on the Em-

18

paques Poliplasticos invoice is not identified as belonging to any business bearing a name resembling "Empaques" or "Plasticos."

- The QR codes on the invoices are not functional;

- The majority of the invoices had the same invoice number: 5937;

- Several invoices bore the same date of *October 7, 2021* even though they were allegedly issued at different points in time during the manufacturing process;

- The invoices lack payment due dates;

- On the initial invoice, which included the Purchase Order with all the purchased equipment's specifications, several of the equipment parts contained a part code identifier of "SML." And, the order confirmation cover page states that the equipment is a "SmartCast" coextrusion castfilm line. SmartCast is a copyrighted brand of SML per their website. SML is an Austrian-based manufacturer of castfilm lines and was named as the manufacturer of the equipment that Zummit allegedly financed through Umpqua Bank prior to defaulting, according to the Arizona Litigation; and

- The wiring instructions on the invoices change from invoice to invoice to various banks located in New York.

66.    On November 2, 2023, Truist sent Stalwart a reservation of rights letter, which, among other things, notified Stalwart that it was in default under its loan agreements, and on November 13, 2023, TEFC sent a substantially similar reservation of rights letter to Stalwart.

67.    As part of their investigation, due diligence, and to evaluate the security of their Collateral, Plaintiffs engaged an independent appraiser, Hilco, to visit the Stalwart facility in Midland, Georgia.

68.    Hilco completed its initial inventory report on or about November 24, 2023. This report indicated that there are material discrepancies between Hilco's inventory of Stalwart's installed equipment and the itemized collateral schedules that Stalwart submitted in connection with its drawdown requests under the TEFC Loan. For example, the newly installed Line 3 financed by TEFC was manufactured by Colines S.p.A., an Italian-based manufacturer and not SML, the manufacturer on the invoices provided. [Do we want to attach the Colines press release as an exhibit?]

69.    For example, Stalwart claimed, for the first time, that the manufacturing equipment known as Line 2, located at Stalwart's Georgia facility that Plaintiffs believed was subject to their security interests, was actually owned by

Zummit —and was *leased* to Stalwart. This alleged leasing relationship, which had never been disclosed to Plaintiffs and does not appear to be documented, is inconsistent with: (i) representations made in legal documents filed in Arizona (discussed further below); (ii) Stalwart's representations about Plaintiffs' Collateral; (iii) representations and warranties made by Zummit to another bank; and (iv) representations made in a December 1, 2023 Information Certificate provided to Truist. To date, Stalwart has *not* provided Plaintiffs with a copy of a purported lease between Stalwart and Zummit or any related documentation.

70.     Plaintiffs also began inquiring about the status of Line 4, including but not limited to the manufacturing progress, the estimated completion date, payments on the line, and any outstanding balance. At that time Stalwart orally claimed Line 4 was approximately 80% complete, but that it has not been finished because Stalwart was unable to further draw on the DDTL Loan. In the past three months, Stalwart has ignored and refused to respond to numerous specific questions regarding the status of Line 4.

71.     Plaintiffs also learned, for the first time, that Empaques Poliplasticos was not the actual manufacturer of Lines 3 and 4, as Stalwart had repeatedly represented through the loan documents, the drawdown requests, the invoices, and the collateral schedules associated with the TEFC Loan and the DDTL Loan. Rather, the actual manufacturer of the Line 3 equipment was Colines, an Italian-

based manufacturer.

72.    Stalwart's misrepresentation of the identity of the manufacturer of the equipment and its provision of false and fraudulent invoices to support its draws constituted an additional default under the terms of Stalwart's loans with Plaintiffs, and demonstrates that Plaintiffs' collateral is at manifest risk of loss.

73.    Following Hilco's initial equipment inventory, Plaintiffs requested Stalwart's cooperation to appraise the Collateral (including all of the equipment, raw goods inventory, and finished goods inventory). For several months, Stalwart failed and refused to cooperate, stonewalling all requests by Plaintiffs to obtain information regarding their Collateral and Stalwart's solvency.

74.    On November 28, 2023, Truist met with Stalwart officers Miguel Luna and Jose Truchuelo in person and advised them that Plaintiffs were no longer interested in financing Stalwart's operations.

75.    Plaintiffs did inform Stalwart that they would consider a short-term forbearance arrangement to allow Stalwart to identify a new lender or investor to refinance Plaintiffs' loans and finance Stalwart's operations. However, the parties were never able to reach an agreement, primarily because Stalwart failed and refused to comply with Plaintiffs' reasonable conditions precedent to such forbearance.

76.    On December 8, 2023, Truist sent a detailed list of document and in-

formation requests and questions to Stalwart.

77.    On December 15, 2023, Stalwart's attorney forwarded Stalwart's balance sheets and income statements for September, October, and November 2023.

78.    These financial documents contained gross disparities from the financial documents Stalwart had previously provided to Plaintiffs earlier in the year, and revealed that Stalwart's financial condition was materially worse than the condition Stalwart had previously conveyed.

79.    For example, in June 2023, Stalwart had reported that its year-to-date net income before taxes was $3,026,011.80. Yet, on its September 2023 statement, Stalwart reported year-to-date net income before taxes of -$6,837,218.84, a negative variance of more than $9 million.

80.    Further, the year-to-date total gross income in September was less than the year-to-date total gross income reported through June of the same year.

81.    The financial reporting from September, October, and November also for the first time included a new "Accruals" line, which, for September 2023, was reported as  -$5,684,598,26.

82.    Truist demanded answers and explanations regarding the dramatic discrepancies in Stalwart's financial reporting. Truist also insisted on an independent field examination of the Collateral (including Stalwart's books and records and details regarding all accounts receivable and accounts payable) as a

condition to any forbearance arrangement.

83.    In late November and through early December, the independent field examiner requested various financial documents and underlying support to enable to the exam to move forward. However, Stalwart failed or refused to comply, and the field examination was postponed.

84.    On January 3, 2024, counsel for Plaintiffs demanded that Stalwart submit all requested financial documentation for testing to Plaintiffs' field examiner by no later January 8, 2024. Again, Stalwart failed or refused to comply.

85.    On January 12, 2024, Truist demanded: (i) access to Stalwart's facility to inspect its books and records pursuant to its inspection rights afforded under the various loan documents, (ii) the production of very specific financial documents, (iii) information regarding the status of the completion and delivery of Line 4, (iv) a copy of the alleged lease between Zummit and Stalwart related to Line 2, (v) access and an appraisal, and (vi) that Stalwart instruct all customers to pay all outstanding accounts receivable into Stalwart's deposit account at Truist, consistent with the parties' loan documents, all no later than January 26, 2024. A true and correct copy of this letter is attached as **Exhibit P**.

86.    Contemporaneous with this request, Stalwart terminated its Chief Financial Officer, Jose Truchuelo, claiming that he had embezzled millions from Stalwart. Blaming Mr. Truchuelo for the totality of its troubles, Stalwart admitted

that the financial and collateral reporting that it had provided to Plaintiffs had been false and fraudulent.

87.    On information and belief, while Mr. Truchuelo may have misappropriated funds from Stalwart (and one or more of its affiliates), it has become apparent to Plaintiffs that Stalwart has used Mr. Truchuelo as a scapegoat for its own systematic bank fraud.

88.    On information and belief, Contreras and her family have known that Mr. Truchuelo used corporate credit cards for Zummit and Stalwart and its affiliates to purchase large amounts of cryptocurrency since at least February 2022. Contreras and her family failed to act, stop, or remedy Mr. Truchuelo's siphoning of funds from Stalwart and Zummit into risky, personal investments until almost two (2) full years later.

89.    Additionally, according to legal filings in Arizona, Contreras and/or Luna knew of Mr. Truchuelo's alleged embezzlement from Zummit for several weeks or months, but inexplicably only took action to terminate him after Plaintiffs demanded access to Stalwart's books and records.

90.    Finally, Stalwart bounced its $200,000 "payment" on the Truist corporate credit card and then charged an additional $209,519.46 *over its* $500,000 credit limit after terminating Mr. Truchuelo from the company.

91.    Stalwart and Contreras have used the termination of Mr. Truchuelo

as an excuse for failing to comply with Plaintiffs' reasonable requests for information. Among other things, Stalwart has denied Plaintiffs' requests for updated financial statements and Collateral financial reports, including current borrowing base reports, accounts receivable aging reports, and inventory reports. This failure to provide financial and Collateral information as requested is a further event of default under the terms of the loan documents and evidence that there is manifest danger of harm to Plaintiffs' Collateral.

92.    In further response to Truist's January 12th demand, Stalwart replied that it was not "in a position to comply with the document deadlines and other deadlines" set by Plaintiffs. Stalwart did not grant Plaintiffs any form of access on January 26, 2024, as demanded, or at any time in February 2024. This failure to comply with Plaintiffs' contractual rights of access, inspection, and appraisals constituted an additional event of default under the terms of the loan documents.

93.    In Plaintiffs' January 12th demand letter, Plaintiffs also demanded that Stalwart deposit all proceeds from its accounts receivable collateral into the Stalwart deposit account at Truist, a contractual right and remedy under the terms of the loan agreements. Stalwart has failed to comply with this demand.

94.    From November through January, Plaintiffs notified Stalwart that it was critical to transition to court oversight of Stalwart's operations and the Collateral through the appointment of a receiver. Plaintiffs urged Stalwart to consent

to the appointment of a neutral receiver for the benefit and protection of all creditors. Stalwart declined, asserting instead that it would file for bankruptcy. However, Plaintiffs have learned that, as of March 8, 2024, Stalwart had not paid any bankruptcy retainers to any of its professionals. Moreover, as of the date of this Complaint, Stalwart has not filed, leaving Plaintiffs to question whether Stalwart ever intended to file for bankruptcy.

95.    In the aftermath of Plaintiffs' January 12 demand, Stalwart also made other changes to its business, including the modification of its website and attempting to blur its association with suspected affiliates.

96.    On February 1, 2024, Stalwart's affiliate and alleged equipment lessor, Zummit, filed a Chapter 7 bankruptcy petition. As noted above, Zummit is owned and controlled by Contreras and Luna, and at the time of filing, had several lawsuits and a receivership action pending against it.

97.    Significantly, Zummit did not identify any alleged lease of the Line 2 equipment with Stalwart as either an unexpired lease or executory contract in its bankruptcy filing. Further, according to a May 26, 2023, security agreement Zummit executed in favor of Umpqua Bank, Zummit represented and warranted that *none* of its equipment was leased by or to any third party. Likewise, in Stalwart's December 1, 2023 Information Certificate, Stalwart represented that that it had no material transactions with any affiliates. All of this information is incon-

sistent with Stalwart's representations to Plaintiffs that Line 2 is "leased" to Stalwart, but owned by Zummit, meaning there is great uncertainty regarding the ownership and security interests applicable to Line 2 and further demonstrating the Stalwart's management team is completely incapable of providing truthful or accurate information about its operations or financial condition.

98.    Notably, in its bankruptcy schedules, Zummit identifies Stalwart as an unsecured creditor holding a $2.77 million claim. This claim apparently arises, according to Zummit/Stalwart's Chief Financial Officer testimony, from plastic that Stalwart delivered to or on behalf of Zummit dating back to 2022, but for which Zummit never paid Stalwart. In other words, Zummit was used to syphon product and money out of Stalwart. Significantly, Stalwart never disclosed A/R in the amount of $2.77 million to Plaintiffs in any of its aging A/R reports or its borrowing base reports. However, there were numerous wires sent from Stalwart's Truist accounts to various Zummit bank accounts (including Sunflower Bank and Umpqua Bank) prior to October 2023.

99.    Zummit also identifies, in its bankruptcy schedules, an asset with $4.8 million in related loan liability allegedly located at Stalwart.

100.    On or about March 5, 2024, after weeks of oral and written requests, Stalwart finally allowed Plaintiffs' appraiser onsite to appraise Plaintiffs' Collateral. However, at all times during the appraiser's visit, Stalwart controlled

and/or limited appraiser's access to the Collateral. For example, Stalwart first attempted to limit the length of the appraisal, claiming the appraisal was highly disruptive to its business operations and that the appraiser had to be accompanied at all times for "safety" reasons.

101.    When the appraiser, Gary Anderson of Plastics One Access Advisors, finally visited the site, Luna escorted Mr. Anderson throughout the facility. Notably, Luna prohibited Mr. Anderson from inspecting, viewing, accessing, or appraising one of the three major film production lines, a Battenfeld Gloucester line, also known as Line 2. Mr. Anderson was threatened with forcible removal from the premises if Mr. Anderson "approached" Line 2. Luna even refused to allow Mr. Anderson to confirm the make and model of the Line 2 equipment.

102.    The Battenfeld Gloucester line was sequestered from the main area of the facility and was not operating. Luna attempted to justify his efforts to obscure Mr. Anderson's inspection and appraisal by stating that Bank of America had a lien on the line and that it was going to be removed from the facility within the next sixty (60) days. The claim that Bank of America had a lien on the Battenfeld Gloucester line had never before been disclosed to Plaintiffs, and Plaintiffs are unable to ascertain the veracity of the claim. However, it is readily apparent that Luna intends to allow the line to be removed from the facility notwithstanding the potential competing security interests therein.

103. Luna also prohibited Mr. Anderson from inspecting, viewing, accessing, or appraising 4 rewinders, which were also sequestered from the main area of the facility even though that equipment is Plaintiffs' Collateral.

104. During his site visit, Mr. Anderson noted approximately 2 million pounds of finished goods scrap on the floor of the facility, and observed that Stalwart was *not* fully operational.

105. Mr. Anderson was asked to evaluate, inspect, and appraise Stalwart's raw material or resin—all of which constitutes Plaintiffs' inventory Collateral. First, Luna forbade Mr. Anderson from accessing the silos and railcars where the inventory is stored. Second, despite numerous requests, Luna failed and refused to supply Mr. Anderson with a routine perpetual inventory report showing the types of resins, costs per pound, pounds on hand, and location of the resin inventory. The failure or refusal to provide this report is particularly troubling because a perpetual inventory report is essential to operations of a plastics business, and is readily producible on demand. Luna promised to provide the report to Mr. Anderson on multiple occasions, but failed to do so for more than a week, eventually providing what should be an instantaneous report *eight* days after Mr. Anderson's site visit. The report provided was incomplete and did not identify Stalwart's costs per pound for the investor, as requested. Moreover, by the time the report was finally provided, Mr. Anderson could do

nothing to verify its accuracy: not only was Mr. Anderson no longer onsite, but because Mr. Anderson had been prohibited from accessing the silos and railcars, Mr. Anderson could not easily match the report to his observations.

106.    The report that Luna ultimately provided on March 7, 2024 was not in the ordinary or customary format that the appraiser is used to seeing. It did not include the cost information requested. It relied on outdated information, including a "last railcar delivery of February 27, 2024," in an industry that requires daily updates to its resin and inventory volumes. Additionally, the inventory report identified that Stalwart had more than 9.5 million pounds of resin on hand. According to the appraiser, that would require approximately 40 railcars. However, only 6 were observed at the facility, and it was reported there were another 2 on the rail spur nearby. Although the appraiser was not permitted to evaluate the railcars and silos, it appears that the report states an amount of resin that is not physically possible based on the appraiser's assessment.

107.    Based on documented evidence of Stalwart's financial mismanagement; its misrepresentations regarding the identity of its manufacturer; its misrepresentations regarding its financial condition; its submission of false and fraudulent invoices and financial statements; its termination of its former Chief Financial Officer for theft and its admission of fraudulent conduct; its failure to identify alleged related party leases and competing secured creditors; its refusal

to cooperate with an appraisal of the Collateral; its refusal to cooperate with Truist's field examination; its refusal to provide access and information to Plaintiffs as reasonably requested; and its alleged history of defrauding other lenders and absconding with such lenders' collateral, there is a manifest danger of loss, destruction, or material injury to the collateral securing Plaintiffs' loans to Stalwart, including by misappropriation and/or removal.

108.    Plaintiffs are interested, secured parties and are threatened with material losses and injuries for which they have no adequate remedy at law.

109.    Plaintiffs are equitably entitled to the immediate appointment of a receiver on an emergency basis to take possession of and hold, subject to the discretion of the Court, the Collateral and Stalwart's revenue, which were pledged as security for Plaintiffs' loans.

110.    All conditions precedent to the enforcement of Plaintiffs' rights and the maintenance of this action, have been performed or have occurred.

## COUNT I – SUIT ON NOTE (the "Revolver")
### (Truist against Stalwart)

111.    Truist incorporates each and every allegation contained in Paragraphs 1 through 110, above as if expressly set forth herein.

112.    Pursuant to the terms of the Revolver, Truist loaned and transferred $12 million to Stalwart.

113.    The Revolver has matured, and Stalwart has defaulted on the terms

of the Revolver, and breached the terms of the Revolver Agreement by, among other things: (i) failing to pay the amounts due thereunder; (ii) cross-defaulting on its other loan obligations to Plaintiffs; (iii) submitting false, fraudulent, incorrect, incomplete, and/or misleading documentation to Truist; (iv) failing to deliver certain reports required under the terms of the Revolver; and (v) failing to provide Truist with access to its Collateral to appraise the same, and interfering with and obstructing Truist's appraisal of the Collateral.

114.   Stalwart's breach of the Revolver has caused Truist to suffer damages and entitles Truist to a money judgment in an amount not less than of $12,000,000 in principal, $403,569.42 in accrued interest through March 15, 2024, $50.00 in late fees, and $4,800 in appraisal costs. Interest continues to accrue on the Revolver at the rate of $2,446.35 *per day*.

115.   Pursuant to the terms of the Revolver loan documents, Truist is entitled to recover its reasonable attorney's fees, default rates of interest, late fees, costs, and expenses for protecting and preserving the Revolver Collateral.

## COUNT II – SUIT ON NOTE (Equipment Finance Loan)
### (TEFC against Stalwart)

116.   TEFC incorporates each and every allegation contained in Paragraphs 1 through 110, above as if expressly set forth herein.

117.   Pursuant to the terms of the TEFC Loan, TEFC advanced, made disbursements, and/or loaned $7 million to Stalwart.

118.    The TEFC Loan has matured, and Stalwart has defaulted on the terms of the TEFC Loan, and breached the terms of the TEFC Loan Agreement by, among other things: (i) failing to pay the amounts due thereunder; (ii) cross-defaulting on its other loan obligations to Plaintiffs; (iii) submitting false, fraudulent, incorrect, incomplete, and/or misleading documentation to TEFC; (iv) failing to deliver certain reports required under the terms of the Revolver; and (v) failing to provide TEFC with  access to its Collateral to appraise the same, and interfering with and obstructing Truist's appraisal of the Collateral.

119.    Stalwart's breach of the TEFC Loan has caused TEFC to suffer damages and entitles TEFC to a money judgment in an amount not less than $7,683,148.14, which includes $7 million in principal, $648,737.22 in accrued interest, and $34,410.92 in other charges. Interest continues to accrue on the TEFC Loan at the rate of $1,437.09 per day.

120.    Pursuant to the terms of the TEFC loan documents, TEFC is also entitled to recover its reasonable attorney's fees, default rates of interest, late fees, and costs and expenses associated with protecting and preserving the TEFC Loan Collateral.

## COUNT III – SUIT ON NOTE (DDTL Loan)
### (Truist against Stalwart)

121.    Truist incorporates each and every allegation contained in Paragraphs 1 through 110, above as if expressly set forth herein.

122.    Pursuant to the terms of the DDTL Loan, Truist advanced, made disbursements, and/or loaned $5,952,860.54 to Stalwart.

123.    Stalwart has defaulted on the terms of the DDTL Loan by, among other things: (i) failing to pay the amounts due thereunder; (ii) cross-defaulting on its other loan obligations to Plaintiffs; (iii) submitting false, fraudulent, incorrect, incomplete, and/or misleading documentation to Truist; (iv) failing to deliver certain reports required under the terms of the Revolver; and (v) failing to provide Truist with  access to its Collateral to appraise the same, and interfering with and obstructing Truist's appraisal of the DDTL Loan Collateral.

124.    Stalwart's breach of the DDTL Loan has caused Truist to suffer damages and entitles Truist to a money judgment in amount no less than $5,952,860.54 in connection with the DDTL Loan, consisting of $5,952,860.54 in principal and $35,272.52 in interest. Interest continues to accrue on the DDTL Loan at the rate of $1,213.16 *per day*.

125.    Pursuant to the DDTL Loan documents, Truist is entitled to recover its reasonable attorney's fees, default rates of interest, late fees, and costs and expenses associated with protecting and preserving the DDTL Loan Collateral.

## COUNT IV – BREACH OF CONTRACT—Corporate Credit Card Agreement
### (Plaintiffs against Stalwart)

126.    Plaintiffs incorporate each and every allegation contained in Para-

graphs 1 through 13 and 50 through 51, above as if expressly set forth herein.

127.   Stalwart has failed to make payments on its corporate credit card account since January 2024, and its last payment bounced. Stalwart is in breach of the corporate credit card agreement, and has caused Truist to suffer damages.

128.   Stalwart currently owes $709,519.46 in principal as of March 15, 2024; (ii) late charges as of March 15, 2024 in the amount of $16,301.96; (iii) accrued interest on the outstanding balance; and (iv) any additional interest, late charges, late fees, and costs.

129.   Pursuant to the terms of the corporate credit agreement, Truist is entitled to recover its reasonable attorney's fees, expenses, and costs in connection with enforcing the terms of the parties' agreement and collection.

## COUNT V – EQUITABLE RECEIVERSHIP
### (Plaintiffs against Stalwart)

130.   Plaintiffs incorporate each and every allegation contained in Paragraphs 1 through 110, above as if expressly set forth herein.

131.   Plaintiffs have valid and perfected security interests in substantially all of the assets of Stalwart, including but not limited to its personal property, equipment, inventory, accounts receivable, general intangibles and other accounts, as well as the proceeds and products therefrom.

132.   Stalwart and its officers are now in control of the Collateral, which is

at risk.

133.    For weeks, Stalwart completely denied Plaintiffs any access to their Collateral for an appraisal. Eventually, Stalwart permitted Plaintiffs to appraise the Collateral, but Luna interfered with and prevented Plaintiffs' appraiser from completing their work by preventing Plaintiffs from inspecting Line 2, 4 rewinders, the railcars, and the silos. Further, Stalwart has failed and refused to provide the appraisers with resin perpetual inventory report, despite numerous requests by the appraiser and numerous promises by Stalwart to do so, preventing Plaintiffs from appraising the raw materials inventory onsite.

134.    Stalwart has failed refused to allow Plaintiffs to inspect its books and records, and has denied Plaintiffs their right to insist on an independent field examination.

135.    Stalwart and its officers have admitted to significant embezzlement and fraudulent activity within its business.

136.    Stalwart has denied ownership of Line 2 equipment, but has failed to produce a lease agreement or any other documents that verify the existence of an alleged lease from Zummit. Moreover, Stalwart's claim that it leases Line 2 from Zummit are in direct conflict with Zummit's bankruptcy filing, representations and warranties Zummit made to Umpqua Bank, and representations Stalwart made to Truist in its December 1, 2023 Information Certificate.

137.    Affiliates of Stalwart, and who have shared ownership or officers with Stalwart, have been accused of and in some instances have been found liable for defaulting on other equipment loans, absconding with the equipment-collateral by moving the equipment to another controlled affiliate, and defrauding banks both nationally and internationally.

138.    Contreras and Luna have a demonstrated a pattern of moving, absconding, and fraudulently transferring collateral to other entities owned or controlled by them when under the threat of a receivership or an adverse judgment.

139.    Indeed, Luna has admitted that Stalwart intends to allow the removal of the Line 2 equipment through self-help before a court in this district, which has jurisdiction over the property, can determine the ownership and priority of any security interests in the same among competing creditors.

140.    Stalwart and its officers have presented false, fraudulent, incorrect, and/or misleading information to substantiate further loan advances, and have further presented false, fraudulent, incorrect, and/or misleading financial documents to Plaintiffs in connection with Plaintiffs' consideration of a loan renewal or forbearance agreement.

141.    According to the appraiser's recent March 5, 2024, visit to Stalwart, Stalwart's business operations are minimal.

142.    To the extent Stalwart is operating, it does not appear to be running

with any efficiency or oversight, as Plaintiffs' appraiser recently observed that approximately 2 million pounds of scrap litters the floors of its Georgia facility.

143. Based on internet postings by apparent employees of Stalwart, upon information and belief, Stalwart is not paying wages to employees on time.

144. A receiver is necessary and proper to manage and control Plaintiffs' Collateral and to assume control over Stalwart's business during the pendency of this action to prevent waste, misappropriation, and to ensure that such Collateral is preserved for the benefit of Stalwart's creditors, including Plaintiffs.

145. A receiver is also necessary and proper to ascertain the ownership and priority of any competing security interests in the Collateral and/or any other property located at Stalwart's Georgia facility.

146. Based on Stalwart's most recent financial statements and the statements of its counsel, Stalwart is either insolvent or in the zone of insolvency, wherein its liabilities exceed the value of its assets and/or Stalwart is unable to pay its debts as they become due and owing in the ordinary course of business.

147. Plaintiffs' interests as secured creditors are compromised and in manifest risk of loss and/or waste.

148. Plaintiffs do not have an adequate remedy at law because their Collateral interests have been jeopardized and there is a substantial risk that their Collateral will be moved or misappropriated before they can exercise any of their

rights and remedies under their respective loan documents and under applicable law.

149.    Plaintiffs will be irreparably harmed by Stalwart's planned dissipation of assets, including assets that may be subject to Plaintiffs' liens, beyond Georgia's borders and before there is a judicial or independent determination as to the priority of liens thereto. In contrast, any risk to Stalwart related to the appointment of a receiver will be minimal because Stalwart's operations are limited or non-existent.

150.    Given that subject loans have matured and/or are all clearly in default, Plaintiffs are likely to prevail on the merits of their claims against Stalwart.

151.    Plaintiffs have provided Stalwart notice of this action and of its myriad defaults.

152.    No bond or a nominal bond should be required based on the state of operations and Stalwart's insolvency. The Court should issue injunctive relief to empower the Receiver to carry out the intended purpose of the receivership.

153.    All assets at the Stalwart facility should not be permitted to be disposed of any manner outside of the confines of this, or other, judicial action.

154.    Plaintiffs reserve all right to take other actions with respect to the collateral as is permitted under the applicable loan documents and under applicable law.

155.    The costs associated with the receivership should ultimately be borne by Stalwart.

## COUNT VI – SUIT ON GUARANTY
### (Plaintiffs against Fruma)

156.    Plaintiffs incorporate each and every allegation contained in Paragraphs 1 through 153, above as if expressly set forth herein.

157.    Fruma executed and delivered the Fruma Guaranties to Plaintiffs, which are absolute and unconditional.

158.    Stalwart has defaulted on the Revolver, the TEFC Loan, and the DDTL Loan by failing to pay amounts due thereunder, through cross-default, and by submitting false, fraudulent, incorrect, incomplete, and/or misleading documentation to Truist.

159.    Stalwart currently owes Truist $12,408,419.42, as of March 15, 2024, with respect to the Revolver, exclusive of attorney's fees, costs, and expenses.

160.    Stalwart currently owes TEFC $7,726,895.63, as of March 15, 2024, with respect to the TEFC Loan, exclusive of attorney's fees, costs, and expenses.

161.    Stalwart currently owes Truist $6,053,151.28, as of March 15, 2024, with respect to the DDTL Loan, exclusive of attorney's fees, costs, and expenses.

162.    Fruma is obligated to pay Plaintiffs all amounts due to them by Stalwart under the terms of the respective loans, as well as all costs, interest, late fees, expenses, and attorney's fees pursuant to the express terms of the Fruma

Guaranties.

163.    Plaintiffs have been damaged as a result of Stalwart's breach, and will remain damaged until paid in full.

### COUNT VII – ATTORNEYS' FEES UNDER O.C.G.A. § 13-1-11 and 13-6-11 (against Stalwart)

188.    Plaintiffs incorporate each and every allegation contained in Paragraphs 1 through 110, above as if expressly set forth herein.

189.    The relevant loan documents expressly provide Plaintiffs with the right to recover their reasonable attorney's fees and expenses in connection with any enforcement of their rights under the terms of the loan agreements and security agreements.

190.    Additionally, Stalwart is liable for attorney's fees, costs, and expenses pursuant to O.C.G.A. § 13-6-11 based on Stalwart's bad faith, stubborn litigiousness, and its putting Plaintiffs to unnecessary trouble and expense.

**WHEREFORE**, Plaintiffs pray for judgment against Defendants as follows:

**A.    On Count I:**

**(a)** On the Revolver, for: (i) the entire unpaid principal balance of the Revolver as of March 15, 2024, in the amount of $12,000,000; (ii) unpaid interest and late charges on the outstanding principal balance through March 15, 2024, in the amount of $403,569.42; (iii) *per diem* interest of $2,439.99; (iv) appraisal and eval-

uation costs of $4,800.00; (v) late charges of $50.00; and (vi) any additional interest, late charges, late fees, costs and expenses of inspection and appraisal in an amount to be proven at trial;

(b) An award of pre- and post-judgment interest to the fullest extent permitted by law;

(c) For an award of attorney's fees and costs; and

(d) For such other and further relief as the Court deems just and proper.

**B.**     **On Count II**:

(a) On the TEFC Loan, for: (i) the entire unpaid principal balance of the TEFC Loan as of March 15, 2024, in the amount of $7 million; (ii) unpaid interest and late charges on the outstanding principal balance through March 15, 2024, in the amount of $683,148.14; (iii) *per diem* interest of $1,437.09; (iv) any additional interest, late charges, late fees, costs and expenses of inspection and appraisal in an amount to be proven at trial;

(b) An award of pre- and post-judgment interest to the fullest extent permitted by law;

(c) For an award of attorney's fees and costs; and

(d) For such other and further relief as the Court deems just and proper.

**C.**     **On Count III:**

(a) On the DDTL Loan, for: (i) the entire unpaid principal balance of the

DDTL Loan as of March 15, 2024, in the amount of $5,952,860.54 (ii) unpaid interest on the outstanding principal balance through March 15, 2024, in the amount of $89,838.42; (iii) *per diem* interest of $1,211.45; (iv) a returned payment fee of $56.00; (v) late charges as of March 15, 2024 in the amount of $10,396.32; plus (vi) any additional interest, late charges, late fees, costs and expenses of inspection and appraisal in an amount to be proven at trial;

(b) An award of pre- and post-judgment interest to the fullest extent permitted by law;

(c) For an award of attorney's fees and costs; and

(d) For such other and further relief as the Court deems just and proper.

**D.    <u>On Count IV</u>:**

(a) On the Corporate Credit Card Agreement, for: (i) the entire unpaid principal balance on the Stalwart corporate credit card as of March 15, 2024, in the amount of $709,519.46; (ii) late charges as of March 15, 2024 in the amount of $16,301.96; (iii) accrued interest on the outstanding balance; (iii) any additional interest, late charges, late fees, and costs;

(b) An award of pre- and post-judgment interest to the fullest extent permitted by law;

(c) For an award of attorney's fees and costs; and

(d) For such other and further relief as the Court deems just and proper.

**E.**    **On Count V:**

(a) For the appointment of a receiver for the Collateral and business operations of Stalwart on the terms set forth in the Application for the Appointment of Receiver and accompanying proposed order and/or on terms to be determined by the Court, and for injunctive relief in connection with such appointment;

(b) An award of Plaintiffs' attorney's fees and costs incurred herein; and

(c) For such other and further relief as the Court deems just and proper.

**F.**    **On Count VI:**

(a)    For (i) the entire unpaid principal balances on each of Stalwart's loans and indebtedness as of March 15, 2024, in the amount of $26,188,466.30; plus all additional and accruing interest, late charges, and costs and expenses of inspection and appraisal in an amount to be proven at trial;

(b) An award of pre- and post-judgment interest to the fullest extent permitted by law;

(c) For an award of attorney's fees and costs; and

(d) For such other and further relief as the Court deems just and proper.

**F.**    **On Count VII:**

(a) For an award of Plaintiffs' attorneys' fees, costs, and expenses.

This 21st day of March, 2024.

<div style="margin-left: 50%">

Respectfully Submitted,

ARNALL GOLDEN GREGORY LLP

*/s/ Jennifer L. Shelfer*
Darryl S. Laddin
Georgia Bar No. 460793
Darryl. Laddin@agg.com
Sean Kulka
Georgia Bar. No. 648919
Sean.Kulka@agg.com
Jennifer L. Shelfer
Georgia Bar No. 557213
Jennifer.Shelfer@agg.com

*Attorneys for Truist Bank and Truist Equipment Finance Corp.*

</div>

171 17th Street, N.W., Suite 2100
Atlanta, Georgia 30363-1031
404-873-7004

## Verification

I, **Lisa Allen**, state that I have read the foregoing **Verified Complaint for Damages and the Emergency Appointment of Receiver**, and the factual content therein truly and correctly reflects my knowledge or information gathered by me or other representatives of Plaintiffs from various sources, and I state that the factual allegations are true and correct to the best of my knowledge, information, and belief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

**Lisa Allen**
**Senior Vice President and Asset Manager**
**Truist Bank**
**Asset Resolution Group**

47